STOULIG, Judge.
Plaintiff, Shirley Geiger, has appealed a judgment dismissing her damage suit based on two brutal beatings by defendant Gar-nett C. Hallmark.[1] We reverse that part of the judgment dismissing her suit against Hallmark.
On October 16, 1973, Hallmark kicked, pushed and punched plaintiff leaving her with a broken arm, two fractured ribs, internal injuries that required exploratory surgery, facial bruises and discoloration, and contusions on her body. As a result she was hospitalized for 11 days. On July 9, 1974, Hallmark once again battered plaintiff with the usual multiple blows to the body and a punch in the right eye that left her with double vision. Again she was hospitalized — this time for four days.
In weighing the evidence, we have viewed it in a light most favorable to the defendant because the result reached by the trial court implies factual discrepancies were resolved in his favor. In relating his version of both altercations, his version is either improbable or inconsistent or both.
The October incident involved a dispute over the woman who later became the third Mrs. Hallmark. Plaintiff and defendant were living together at the time and Shirley Geiger found a money clip given to defend *1032 ant by another woman. She pretended to throw it from the window of their second story apartment into Dauphine Street and defendant became enraged. According to her, defendant first broke her arm, then continuously punched her, kicked her and finally walked into the bedroom and locked the door. She used a knife to spring the lock in an attempt to get her clothes and belongings so she could leave. Defendant pushed her out of the bedroom twice, re-locking the door and when she went back a third time she succeeded in getting her belongings.
Hallmark has insinuated through his defense that his actions were reasonable either because she was threatening him with a knife or inflicting severe pain by grabbing his genitals. But he tells different stories at the deposition and at the trial.
In his deposition he said the fight started when plaintiff threw two or three drinks on him as he was lying in bed because he was ignoring her. He said he threw her out and locked the door and three different times she came into the room carrying a kitchen knife six inches long (including blade and handle). He admitted he was not afraid of her or the knife and that he was stronger than she. Finally when she threw his money clip out (or pretended to), he pushed her on the couch. She started to attack him and he threw her to the floor and would slap her back down every time she tried to get up. He said he finally kicked her when she grabbed his genitals and kept kicking until she let go. (At this point in the fight no matter whose version is believed, plaintiff had a broken arm.)
At the trial Hallmark said the money clip incident started the fight and the knife scenes in the bedroom came later. Hallmark denied hitting plaintiff with his fist, yet Joanne Thaxton, the friend who took plaintiff to the hospital after the beating, said she clearly saw the imprint of what she recognized to be defendant’s ring on plaintiff’s battered body.
Benny Thaxton, Joanne’s husband, who also knew defendant, testified Hallmark told him a week later he beat Shirley up because he got tired arguing with her.
The second incident also finds defendant with conflicting stories at trial and deposition. Plaintiff and defendant had resumed sharing an apartment when she was released from the hospital in October 1973 and continued this arrangement until early March 1974. Although they decided to live separately they continued seeing each other. On July 8, 1974 they arranged to meet for a few drinks and ultimately decided to share accommodations at the Downtowner Motel. Plaintiff said she was sitting on the bed in their room when for no apparent reason Hallmark walked in, made some reference to the lobby and punched her in the eye and then continued to beat her.
Defendant however contradicted her. In the deposition he testified he was drunk and had passed out as soon as he stretched out on the bed and remembers nothing else until he found himself on the floor with plaintiff on top of him. In pushing or shoving her aside, somehow she got a black eye, presumably by striking a piece of furniture. At the trial he testified his blow to plaintiff was in response to her attempting to pull him up or out of bed by yanking his hair.
We find defendant viciously beat the plaintiff both times. Undoubtedly the money clip incident was provocation to anger; but defendant’s response was out of proportion.[2] The most favorable legal proposition to defendant is that in both instances plaintiff was the aggressor. Even were we to accept this argument, defendant would still be liable because he is only entitled to repel an attack with reasonable force. In the version where he describes Mrs. Geiger as a threatening presence, he admits he was not afraid of her or the knife. This is demonstrated by the fact that he did not attempt to take it away from her on the two times he locked her out of the bedroom.
No matter which of defendant’s versions of the July incident we accept — pushing *1033 plaintiff from him as he lay on the floor or punching her after she pulled his hair — neither justifies battering the alleged aggressor into the hospital.
Defendant used excessive force in responding to both incidents and is answerable in damages. In Deville v. Wilks, 229 So.2d 128, 130 (La.App. 3rd Cir. 1969); the court drew the limits of self-defense, viz:
“The established rule is that a party who resorts to excessive violence and unnecessary force in repelling an assault, although initially acting in self-defense, becomes liable as an aggressor and is subject to an action for damages for assault and battery. Gallagher v. Taylor, 203 So.2d 773 (La.App. 2 Cir. 1967).”
See also Tripoli v. Gurry, 253 La. 473, 218 So.2d 563 (1969).
Turning to quantum, we think an award of $15,900 is justified in this case. This award includes special damages of approximately $3,900 of which $360 constitutes lost wages and the balance is medical expenses.
As a result of the first battery, she incurred a broken arm, multiple bruises, two fractured ribs and an internal puncture that required sutures after exploratory surgery. The surgery left a 10-inch abdominal scar which plaintiff displayed to the trial court. Her arm was set in a cast and it mended within the normal six to eight weeks. Her disability from the first episode lasted six months.
As to the second incident, the double vision problem was the most serious, but she discontinued treatment after five weeks. In addition to the multiple bruises over her torso, she was required to undergo two separate surgical procedures (1) to correct the blepharoptosis[3] and (2) to remedy the cosmetic problem associated with the eye injury.
For the reasons assigned, the judgment appealed from is affirmed insofar as it dismisses plaintiff’s suit against the ABC Insurance Company, Allright New Orleans, Inc., and its insurer. The judgment appealed from is reversed insofar as it dismisses the suit against Garnett C. Hallmark and it is ordered, adjudged and decreed that there be judgment in favor of Shirley Geiger and against Garnett C. Hallmark in the sum of $15,900 with legal interest from judicial demand and for all costs.

AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.

. Also named defendants were ABC Insurance Company in the event Hallmark had a homeowner’s policy (he did not); Allright New Orleans, Inc., Hallmark’s employer, and its liability insurer. No effort was made in the trial to establish liability of the employer and its insurers.

. See discussion of the aggressor doctrine in 1 So.U.L.Rev. 91 (1974).

. Blepharoptosis is the drooping of the upper eyelid.